# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JEFF POFF,

      Plaintiff,

      v.             Case No. 09-CV-1165

CAPTAIN GEMPELER, LT. BRAEMER,
CO II MEDEMA, CO PONTOW,
CO II BILLINGTON, COIICHRISTIANSON,
and JOHN DOES,

      Defendants.

## DECISION AND ORDER FOR JUDGMENT

From June 26, 2012, to June 28, 2012, a trial to the court was conducted in this action. Having now considered the testimony, the exhibits, and the submissions of the parties, the following constitutes the court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52.

The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the matter arises under federal statutes. Venue is proper under 28 U.S.C. § 1391. The case was assigned according to the random assignment of civil cases pursuant to 28 U.S.C. §636(b)(1)(B) and General Local Rule 72 (E.D. Wis.). The parties have consented to United States magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c) and General Local Rule 73 (E.D. Wis.).

### I. Parties and Witnesses

The plaintiff, Jeff Poff, is a Wisconsin state prisoner incarcerated at Waupun Correctional Institution ("WCI"), a maximum-security institution located in Waupun, Wisconsin. The defendants,

who were employed at WCI at all times relevant, are as follows: former Captain Debra Gempeler[1]; Lieutenant Daniel Braemer; Correctional Officers Eric Billington, Billy Pontow, and Johnathan Christianson; and former Correctional Officer Marc Medema[2].

In addition to the parties listed above, the following witness testified at the trial: Nurse Frances Monroe Jennings, who was formerly employed as a registered nurse at WCI; Dr. Paul Henry Sumnicht, the WCI medical doctor; Father Jose Moreno, a Milwaukee, Wisconsin, pastor who celebrates Spanish mass at WCI; Clarence Easterling, a Wisconsin prisoner who testified via video-conference from Stanley Correctional Institution; and Shawn Matz, a Wisconsin prisoner incarcerated at Columbia Correctional Institution.

## II. Excessive Force Claim

On October 23, 2008, Poff was housed at WCI in the North Cell Hall. That day, Poff was accused of soliciting Father Jose Moreno, in violation of Wisconsin Administrative Code § DOC 303.26, Soliciting Staff. Due to the alleged violation, Poff was to be removed from his cell and placed in Temporary Lockup ("TLU"). Poff did not believe he was in violation of DOC rules. He therefore became agitated and refused to voluntarily leave his cell.

At about 9:00 p.m., Lieutenant Braemer received a phone call from Captain Muraski asking that Poff be placed into TLU status. Braemer went to the North Cell Hall, approached Poff's cell, and informed Poff that he was placing him in TLU. Poff stated that he was not going to comply with Braemer's order, began to act erratically, and threatened to hurt himself if officers entered his cell. He

---

[1] Ms. Gempeler retired from the State of Wisconsin in 2011 and is now self-employed.

[2] Mr. Medema is currently employed as a patrol officer with the Fond du Lac Police Department, Fond du Lac, Wisconsin.

tore up his personal bible and threw the pages on the floor.

After Lieutenant Braemer had been in the North Cell Hall for a period of time, Captain Gempeler received a call from Officer Rosenthal asking that she send the "Mark 9 OC Fogger" to the cell hall because Poff was refusing orders to be restrained. Gempeler went to the North Cell Hall and attempted to gain compliance but Poff immediately began yelling that Gempeler was responsible for the death of his wife and child. Because Gempeler's presence was making Poff more upset, she left the immediate area. Officer Rosenthal obtained the Mark 9 OC Fogger from the North Cell Hall sergeant. Braemer told Poff that he had OC ("Oleoresin Capsicum," also known as pepper spray). Poff continued to disobey staff directives to get dressed and come to the door to be restrained in order to be placed in TLU status.

A short time later, Lieutenant Braemer asked that a cell extraction team be assembled. The team met in the North Cell Hall and Gempeler led the team to Poff's cell where Braemer continued to monitor Poff's activities. Braemer then instructed Poff that a cell extraction team would be assembled in front of his cell and gave him another directive to come to the front door of the cell to be restrained for TLU placement. Poff stated, "I ain't coming out on my own." The team was assembled outside of Poff's cell as a show of force. Braemer informed Poff that he was in possession of the Mark 9 OC Fogger and would administer agents into the cell if he did not come forward and place his hands out of the trap to be restrained. Poff then did a karate kick to the cell door and stated "bring in the goon squad, mother fucker."

The trap was opened and Lieutenant Braemer administered a one-second application of 5.5% OC. Braemer waited and continued to attempt to gain Poff's compliance. After a period of time, a second one-second burst of OC was applied. Braemer turned the team over to Officer Medema, who gave Poff

3

a directive to be restrained. When Poff showed no signs of compliance, Officer Steinert called for the cell door to be opened and the team entered the cell.

The cell extraction team consisted of four officers: Officer Medema was team leader, Officer Pontow was Pad #1, Officer Christianson was Pad #2, and Officer Billington was the restraints person. Pad #1 is assigned to enter the cell first, direct the subject to the back wall, and control an arm. As Pad #2, Christianson entered the cell second while attempting to control Poff's descent to the floor. Medema entered the cell third and, as team leader, was responsible for all communication with Poff. Billington was the fourth and final officer to enter the cell. Poff stood facing the rear cell wall when the officers entered. Once on the floor, he was positioned face-down with his head towards the cell door and his legs toward the rear wall of the cell.

This case centers on what took place between the time when Officers Pontow, Christianson, Medema, and Billington entered the cell and when they escorted Poff out of cell in hand-cuffs and leg restraints, a duration of about three minutes.

According to Poff, after the cell door was opened, the cell extraction team entered the cell, slammed him against the back wall of the cell, and threw him to the ground face down. While Poff was being restrained, the officers punched and kicked him. Poff testified that he did not resist after the cell door was opened. Poff thinks it was Christianson who was beating him because, according to Poff, Christianson later told him that he got carried away during the incident. Inmate Shawn Matz testified that Christianson told him that Poff was not resisting during the incident, that the officers got out of hand, and that Christianson felt bad, especially after discovering that Poff had been overseas in the military.

Officers Christianson, Pontow, Billington, and Medema, on the other hand, all testified that they

4

did not kick, punch, or beat Poff, nor did anyone else kick, beat, or punch him during the cell extraction. According to the officers, they rushed in and forced Poff against the wall. Christianson testified that they do not hold back during cell entries but rather enter at "100 percent," which is what they did here. Pontow secured Poff's right arm and tried to control his descent to the floor. Once on the floor, Pontow was positioned at the right side of Poff's lower body. Christianson was also on Poff's right side, had control of Poff's head, and was covering his eyes, which is standard practice. By the time Billington entered the cell, Poff was already on the floor. Billington was positioned at the left side of Poff's head and also passed the hand-cuffs and leg restraints to Medema. Medema, who secured the hand-cuffs and leg restraints on Poff, testified that Poff resisted. Specifically, Poff would not take his left arm out from under his body to be hand-cuffed and, once his hands were cuffed, Poff kicked his legs so that Medema could not get the leg restraints on right away. Billington, Christianson, and Pontow testified that Poff did not resist them personally. Finally, Christianson testified that Shawn Matz's testimony that they had a conversation about the incident during which Christianson said things got out of hand and he felt bad was "100 percent" untruthful.

Gempeler could not see into Poff's cell while the team was inside. Braemer was not part of the cell extraction team, so he did not enter Poff's cell. However, Braemer testified that he observed the cell extraction team carry out their duties.

After Poff was restrained and removed from the cell, he held his left leg up and complained that he could not walk. A wheelchair was provided to him.

On arrival to the Health Segregation Complex ("HSC"), Poff was assessed by Nurse Frances Monroe Jennings. He responded to the question, "How do you feel" by replying, "How do you think I feel?!" The sclera (white of the eye) of both of his eyes were red, his eyes were watery, and his eyelids

5

were swollen. Poff's face, ears, and neck were red and his left lateral eyebrow had an abrasion with walnut-sized edema and swelling. His right lateral orbit was ecchymotic/bruised. There was edema and swelling to his right forehead above and lateral to his eyebrow. Poff was showered and his face was thoroughly rinsed. He was handcuffed behind his back. After Poff was placed in the cell, his wrists were inspected through the window. He had positive range of motion and a bruise to his left medial wrist. Poff stated to the nurse, "I'm ok."

Poff testified that after the incident, he felt like a truck had run over him. He had constant headaches, could not see, vomited several times, was dizzy upon arising, and his neck, wrists, back, ribs, face, and head were injured. He did not report that he had been punched right away because he did not see his face until October 25, 2008, two days after the incident, because he did not have access to a mirror until that time. Today, Poff claims to suffer from migraines, has nightmares, is jumpy and tense, has severe anxiety, and has to wear glasses.

On October 25, 2008, photographs were taken of the injuries Poff claimed were sustained from the October 23, 2008 cell extraction. Nurse Monroe Jennings testified that the photos of Poff's injuries show subcojunctival hemorrhage which could be caused by a sneeze and that the sclera of his eyes were red from pepper spray. She also testified that it is possible to see those injuries for a cell extraction, even if there was no resistance. Based on Poff's medical records, Nurse Monroe Jennings opined that he did not have a serious medical problem on October 23, 2008, or after October 23, 2008.

The Eighth Amendment Cruel and Unusual Punishments Clause prohibits the "unnecessary and wanton infliction of pain" on prisoners. *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). In cases involving the use of excessive force, the central question is "whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 6-7. Several factors

6

are relevant to this determination, including "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* at 7.

Another factor relevant in evaluating the use of force is the extent of an inmate's injuries. *Id.* at 7. While it is not necessary that a plaintiff demonstrate significant injury to establish excessive force, "the degree of injury is relevant to determining whether the use of force could plausibly have been thought necessary in a particular situation[.]" *Lunsford v. Bennett*, 17 F.3d 1574, 1582 (7th Cir. 1994) (internal quotations omitted). Hence, a minor injury supports the conclusion that the incident was "at most . . . a *de minimus* use of force not intended to cause pain or injury to the inmate." *Id.* An excessive force claim ordinarily cannot be predicated on a de minimus use of force. *DeWalt v. Carter*, 224 F.3d 607, 620 (7th Cir. 2000). Rather, the level of force required to prevail on an Eighth Amendment claim is that which is "repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 10.

"To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety." *Guitron v. Paul*, 675 F.3d 1044, 1045-46 (7th Cir. 2012) (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Id.* (quoting *Whitley*, 475 U.S. at 319). "Even if 'it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable' . . . an error of judgment does not convert a prison security measure into a constitutional violation." *Id.* at 1046 (quoting *Whitley,* 475 U.S. at 319).

In this case, the cell extraction team entered Poff's cell only after repeated orders to come to the

7

front of his cell to be restrained, and two bursts of OC spray, proved unsuccessful. After that, the team entered with full force and restrained Poff as quickly as possible. No doubt the circumstances surrounding the incident were stressful and frustrating for Poff, but he is required to follow orders.

> Orders given must be obeyed. Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. . . . Inmates are and must be required to obey orders. When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials. Such refusal and denial of authority places the staff and other inmates in danger.

*Lewis v. Downey*, 581 F.3d 467, 476-77 (7th Cir. 2009) (quoting *Soto v. Dickey*, 744 F.2d, 1260, 1267 (7th Cir. 1984)).

The testimony and other evidence submitted at trial leads this court to conclude that on October 23, 2008, force was used against Poff to maintain and restore discipline. As an initial matter, the court credits the officers' testimony that they did not kick, punch, or beat Poff. Simply put, the court finds the officers' testimony to be more credible than Poff's on that issue. In addition, Poff's injuries are consistent with being pepper sprayed, pushed up against a wall, and taken down to the floor. They are not consistent with being punched in the face, as Poff testified. During his medical examination by Nurse Monroe Jennings immediately following the incident, Poff did not mention being punched in the face, but he did complain about his ankle being hurt. Poff explained this omission when he testified that he did not have the opportunity to look in a mirror until two days after the incident. However, it is unbelievable that, under the circumstances, Poff would need to look in the mirror to realize he had been punched in the face.

In addition to trial testimony and Poff's injuries, the videotape corroborates the defendants' version of the incident. Careful review of the videotape shows the officers forcefully and swiftly entered the cell and took Poff to the ground, and then Medema applied hand-cuffs and leg restraints. Medema

8

appears to struggle to secure Poff's left arm, and he orders Poff to "stop resisting" several times. There is a delay in placing the leg restraints, which substantiates the defendants' version that Poff initially moved his legs around. The video does not support a finding that any officer was punching or kicking Poff. The video also does not support a finding that any officer was on his neck, although Poff is heard yelling, "get off my neck." In that regard, Officer Christianson testified that Poff was likely feeling the effects of OC spray, which can feel like pressure on the neck.

The court concludes that the evidence demonstrates that the officers applied force in a good faith effort to restore discipline, not maliciously and sadistically to cause harm. Thus, the court finds in favor of the defendants on the excessive force claim.

### III. Failure to Act Claim

The plaintiff's claim that defendants Braemer and Gempeler failed to intervene remains. It is well-established that "an official satisfies the personal responsibility requirement of § 1983 if she acts or *fails* to act with a deliberate or reckless disregard of the plaintiff's constitutional rights." *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). However, there must be an underlying violation of the plaintiff's constitutional rights. "Simply put, there was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention." *Fillmore*, 358 F.3d at 506. The court's finding that the cell entry team did not use excessive force compels a finding in favor of Braemer and Gempeler on this claim.

### IV. Additional Matters

Portions of the defendants' motion in limine (Docket No. 94) are still pending. Specifically, the defendants moved the court for orders limiting or excluding testimony at trial as follows: (1) barring Poff from presenting any evidence or testimony regarding DOC employees' job disciplinary history, arrest

9

records, and employment history; and (2) barring Poff from presenting any evidence or testimony regarding emotional distress or mental anguish. These issues were addressed at trial in that the court allowed limited testimony regarding an employment disciplinary issue involving Officer Christianson, and the court permitted Poff to testify with respect to his emotional distress following the incident. Hence, the motion is limine will be denied as moot.

Also, the defendants filed a motion for dismissal pursuant to Federal Rule of Civil Procedure 41(b) at the conclusion of their case. However, given the court's decision on the merits in favor of the defendants, their motion is moot.

Finally, the court wishes to express it appreciation to Attorney Nathaniel Cade, who accepted the appointment to represent Mr. Poff in this case. Attorney Cade's representation of Mr. Poff was most zealous, highly professional, thorough and effective. Both the administration of justice and Mr. Poff himself benefitted greatly from Attorney Cade's willingness to take the appointment.

**NOW THEREFORE IT IS ORDERED** that the defendants' motion in limine (Docket No. 94) be and hereby is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that judgment be entered in favor of the defendants and against the plaintiff; and

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

Dated at Milwaukee, Wisconsin this 17th day of July, 2012.

**BY THE COURT**:

s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge